UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHANMUGAM BALASUBRAMANIAM,<br><br>Plaintiff,<br><br>v.<br><br>SOURCE CONSULTING, LLC, et al.,<br><br>Defendants. | Civil Action No. 24-10105-JCB |

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
[Docket Nos. 66, 73]

November 18, 2025

Boal, M.J.

In this action, plaintiff Shanmugam Balasubramaniam alleges that he and defendants[1] entered into an agreement whereby Balasubramaniam would identify potential acquisitions for defendant Source Consulting, LLC ("Source") to acquire in exchange for a 30% ownership interest and right to participate in an additional 10% equity investment. After Balasubramaniam's efforts led to the acquisition of ASA Solutions, defendants reneged on the Agreement. Balasubramaniam brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraudulent inducement, quantum meruit, and specific performance. The parties have filed cross-motions for summary judgment.

---

[1] On May 16, 2025, this Court granted Balasubramanian's motion to dismiss defendant Srinivas H. Bhopal from this action. Docket No. 29. On November 14, 2025, the parties filed a stipulation voluntarily dismissing the claims against defendant Ryko Enterprises LLC ("Ryko"). Docket No. 98. Accordingly, the Defendants' motion for summary judgment as to the claims against Ryko is moot.

1

Docket Nos. 66, 73.[2]  For the following reasons, I deny both motions.

I.     FACTS[3]

    A.     The Parties

Balasubramaniam is a businessman with qualifications as a Chartered Accountant from India, maintains a degree in commerce and a C8 professional qualification, and currently works in consultant advisory services.[4]

Source is a Massachusetts limited liability company which provides professional, technology staffing, and recruiting services.[5]  Defendant Srinivas Bolla is the founder and CEO of Source.[6]  He has complete operational control over Source.[7]  Defendant Lakshmisujatha

---

[2] On January 30, 2024, the parties consented to the jurisdiction of a magistrate judge for all purposes.  Docket No. 11.

[3] The facts are taken from the parties' Combined Statement of Undisputed Material Facts (Docket No. 91).  Statements of fact are referred to as "SOF" while responses are referred to as "Resp."  This Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in that party's favor.  Baum-Holland v. Hilton El Con Management, LLC, 964 F.3d 77, 87 (1st Cir. 2020) (citations omitted).

[4] SOF ¶ 1.  In response to this fact, Defendants state that they "are aware of Plaintiff's stated qualifications and will call upon him to prove the same at trial."  Resp. ¶ 1.  Such response does not create an issue of fact.  If Defendants wish to dispute this statement, they must point to evidence of record that would controvert it.  They have failed to do so.  See Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 10 (1st Cir. 2025) ("Without appropriate record citations, [plaintiff's] oppositions rest on mere allegations.  And since, 'mere allegations are not entitled to weight in the summary judgment calculus,' a 'party cannot successfully oppose a motion for summary judgment by resting [upon them].'") (internal citations omitted).  Accordingly, this statement is deemed admitted for purposes of the motion for summary judgment.  This Court notes that many of Defendants' responses to Balasubramaniam's statements of fact do not cite to any evidence of record.  Any such responses are also deemed admitted for purposes of this motion.

[5] SOF ¶ 3.

[6] SOF ¶ 4; Resp. ¶ 4.

[7] SOF ¶ 4.

Vakalapudi is Bolla's wife and a manager and member of Source.[8] She is a complete owner of Source and ASA Solutions, Inc. ("ASA").[9] Along with Bolla, she serves as a member of the board of directors of Source.[10]

Non-party Srinivas H. Bhopal is the Vice President of Sales and Operations at Source, and has worked at Source since 2019.[11] Non-party Kal Bhakta was the former CEO of ASA, prior to ASA's acquisition by Source.[12]

> B.    The Alleged Agreement

Balasubramaniam and Bhopal have been personal friends for roughly three decades.[13] Around the Fall of 2019, Bhophal approached Balasubramaniam for ideas and help with scaling the business of Source.[14] On November 22, 2021, Balasubramaniam, Bhopal, and Bolla met at a restaurant in Milford, Connecticut to discuss potentially engaging Balasubramaniam.[15] At that meeting, the parties agreed that Balasubramaniam would assist Source in identifying, analyzing, and negotiating with potential companies to be acquired by Source in exchange for equity in the

---

[8] SOF ¶ 5; Resp. ¶ 5.

[9] SOF ¶ 5.

[10] Id. Defendants maintain that Vakalapudi had/has no operational involvement in Source's business at the relevant times or now, nor specifically in the ASA transaction but cites to no evidence of record in support of that assertion. See Resp. ¶ 5.

[11] SOF ¶ 6; Resp. ¶ 6.

[12] SOF ¶ 7; Resp. ¶ 7.

[13] SOF ¶ 13; Resp. ¶ 13.

[14] SOF ¶ 9.

[15] SOF ¶ 17.

acquired company.[16]

In or around the end of the December 2021, Balasubramaniam requested from Bhopal a model detailing the terms of his engagement with and compensation from Source.[17] On December 30, 2021, Bolla sent Balasubramaniam the following email (the "Memorialization Email"):[18]

> Hi Shan, Thank you for your patience as we work through to finalize the working model. We highly value your advise and support. Please see the details below
>
> Role: Business Strategy Officer - Inorganic Growth
>
> Responsibilities:
> - Architect a model to utilize the $3M of internal accruals and debt/equity funding to acquire technology companies.
> - Annual Revenue(tentative):
>   - 2022: $5M
>   - 2023: $7M
>   - 2024: $12M
> - Gross Margin: 25%
>
> Support:
> - Investment potential: $3M
> - Operations and execution from Source Consulting team
> - Leveraging Source track record, customer references, cross-selling opportunities, consultant base
>
> Reward Sharing:
> - Creation of equity pool of upto 30% in acquired companies to be vested over a 3 year period based on reaching goals
> - Upfront investment of upto 10% equity at the time of acquisition of a company
>
> Risk Sharing:
> - This needs to be discussed and agreed upon
>
> Next steps:
> - Half-day workshop to discuss and agree on goals and engagement model
> - Detailed operational plan with roles, responsibilities, reporting, investment
> - Weekly operations meeting to track progress
>
> Best,
>
> Sri Bolla

On the same day, Balasubramaniam responded to the Memorialization Agreement as follows:

> Hi Sri,

---

[16] SOF ¶ 18.

[17] SOF ¶ 20; Resp. ¶ 20.

[18] SOF ¶ 24; Resp. ¶ 24; Ex. 4.

> A very happy new year to you, Srini, your families and loved ones. We can use the notes sent by you (thanks by the sway [sic] for sharing) to iron out the details. I am fine with the broad construct with an understanding we will bring in more clarity and English and fix gaps (will send details). The beginning of 2022 is also the beginning of a potentially win–win relationship. Look forward.
>
> Shan[19]

Following Balasubramaniam's December 30, 2021, email, he immediately commenced work on a potential acquisition for Source.[20] Specifically, Balasubramaniam began researching, analyzing, and negotiating with various companies for Source to acquire.[21] Balasubramaniam, Bolla, and Bhopal engaged in weekly calls to discuss potential acquisitions.[22]

Eventually, ASA was identified as a potential acquisition target.[23] Balasubramanian alleges that he led Source's efforts to acquire ASA. Docket No. 80 at 8. The record shows that Balasubramaniam was involved in internal communications within Source regarding the potential acquisition and in communications and negotiations with ASA.[24]

On August 23, 2022, Balasubramaniam emailed Bolla stating, "[n]ow that we are close to finalizing the ASA deal I jotted down some structure for my services largely in line with what we agreed. Please do take a look and let me know if you have comments. Feel free to call me if

---

[19] SOF ¶ 25; Resp. ¶ 25.

[20] SOF ¶ 31.

[21] SOF ¶ 32.

[22] SOF ¶ 35.

[23] See SOF ¶ 36; Resp. ¶ 36.

[24] See, e.g., SOF ¶¶ 63, 65, 69, 70, 71, 73, 75, 76, 82, 132; Resp. ¶¶ 63, 65, 69, 70, 71, 73, 75, 76, 82, 132.

you have questions."[25] The email attached a document proposing "terms of engagement."

Balasubramanian first stated:

> As we get closer to our first acquisition we should bring in some structure to the ASA transaction vis-à-vis my participation.
>
> We agreed on two key items:
> - 30% equity
> - 10% investment[26]

Balasubramanian further stated as follows:[27]

> **Terms of engagement**
>
> From an Asset Purchase construct of acquisition, we will be setting up a new company to acquire the assets of the Target company. Let's set a share capital amount of (say) $100k for the new company. On incorporation I will BUY $30,000 stake in the company by investing the $30k. In addition, and where I choose/agree to invest the additional 10% I will make that investment from my own source. You/Source/your spouse can invest the remaining amount as your investment. You/Source can reimburse the $30,000 at some point in time and I will treat it as a taxable income. That will be the initial shareholding of the company. I would like to plan for some tax implications of the equity participation in the companies you/Source acquires and this will be the best option for us.
>
> Any additional contributions you/Source bring towards you/your investment into the company can be treated as an unsecured loan to the company. Since you/Source will also be applying for a Bank loan your/Source unsecured loan can be repaid to you/Source back after the Bank loan has been repaid. That way you/your net investment remains under $100k.
>
> I will agree to hold the equity for a period of three-year lock-in unless we both mutually agree to release that lock-in sooner. Of this 10% will be locked for 3 years, 10% for 2 years and 10% for 1 year.
>
> My equity holding can be diluted in three ways:
> 1. You/Source can buy the stake
> 2. If you/Source do not exercise your first right of refusal I will sell it to someone else
> 3. On we selling the company together-part or whole.
>
> My risk sharing is already plugged into this model. I will get 30% of what the company is valued at. My liabilities will be restricted to the equity investment I make.
>
> Alternatively, if you/Source would like to dilute your holding we will follow the same three ways as above.

---

[25] SOF ¶ 137; Resp. ¶ 137; see also Ex. 71.

[26] SOF ¶ 138; see also Ex. 71.

[27] SOF ¶ 139; see also Ex. 71.

Bhopal responded as follows:[28]

> **Terms of engagement**
>
> From an Asset Purchase construct of acquisition, we will be setting up a new company to acquire the assets of the Target company. Let's set a share capital amount of (say) $100k for the new company. On incorporation I will BUY $30,000 stake in the company by investing the $30k. In addition, and where I choose/agree to invest the additional 10% I will make that investment from my own source. You/Source/your spouse can invest the remaining amount as your investment. You/Source can reimburse the $30,000 at some point in time and I will treat it as a taxable income. That will be the initial shareholding of the company. I would like to plan for some tax implications of the equity participation in the companies you/Source acquires and this will be the best option for us.
> Comment: This means that we will be parting with 30% equity in an asset which was purchased at $7M valuation and payment of hard cash for payment of $30,000 which is valued at $2.1M! What is the rationale for this? How is this reasonable/equitable? If someone were to offer these terms to you, would you accept?
>
> Any additional contributions you/Source bring towards you/your investment into the company can be treated as an unsecured loan to the company. Since you/Source will also be applying for a Bank loan your/Source unsecured loan can be repaid to you/Source back after the Bank loan has been repaid. That way you/your net investment remains under $100k.
> Comment: Source/personal infusion into the company will be to the extent of $7M which has to be returned by the NewCo. to Source/me and this is the total risk that is being taken till the money is repaid. Without this funding this deal cannot proceed. For assumption of this risk, Source/person will own the majority equity and not just based on share capital amount.
>
> I will agree to hold the equity for a period of three-year lock-in unless we both mutually agree to release that lock-in sooner. Of this 10% will be locked for 3 years, 10% for 2 years and 10% for 1 year.
> Comment: We had talked about equity vesting on achieving performance goals so at this point, this may be moot.

On August 24, 2022, Bolla responded to Balasubramanian's email:

> Hi Shan, I am surprised and shocked to see your structure which is not in line with our discussions.
>
> I spoke with Srini multiple times (at least 3 calls) on your engagement prior to the start of our journey. He clearly explained how the equity works in terms of Revenue and Profit goals. But I don't see the references in your document.
>
> I acquired my 2nd company entirely on my own. It's a 1M company. But I negotiated every detail of it on my own (Srini wasn't a part of these discussions). The equity we planned for you based on growth and revenue goals. I am not discrediting your effort or excellence. I admire and appreciate all your work. But the work starts after the acquisition, and you will be rewarded based on the results
>
> Please see the attached with my comments. If you have any questions, I

---

[28] SOF ¶ 148; Ex. 74.

will setup a call between three of us.[29]

Attached to Bolla's email was Balasubramanian's original document with commentary from Bolla:[30]

> Sri Bolla,
>
> As we get closer to our first acquisition, we should bring in some structure to the ASA transaction vis-à-vis my participation.
>
> We agreed on two key items:
>
> - 30% equity
>
> Sri Bolla: This equity is contingent upon performance of the new entity – y-o-y growth and 25% gross margin over a 3-year term @10% vesting each year (terms discussed via email on Dec 30, 2021 and by Srini. Attached email at the bottom for your reference)
>
> Subsequently we discussed and agreed that the first installment of 10% equity will be granted at the time of closing of the deal. You are responsible for YOY growth and 25% gross margin at the end of 1st year from the deal close date. You are getting close to $700k value at no cash investment!
>
> The second and third installments of 10% each (equity) will vest on completion of 2nd and 3rd year on the meeting the revenue and margin goals as described above.
>
> We believe this growth, margins and the equity grant will be possible due to your direct involvement and leadership
>
> - 10% investment
>
> Sri Bolla: This will be at the purchase valuation of the asset/company. In this case if the valuation is $7M then the 10% equity can be purchased on an investment of close to $700,000 right?

The parties continued to disagree on what had been agreed upon.[31]

On November 30, 2022, Summer Solutions Inc. ("Summer Solutions") and ASA executed a Contract for Sale of Assets whereby Summer Solutions—an entity that had been formed for the purposes of acquiring ASA—purchased ASA for $5,170,000.[32] To date, Source

---

[29] SOF ¶ 151; Resp. ¶ 151; see also Ex. 75.

[30] SOF ¶ 153; Resp. ¶ 153; see also Ex. 75.

[31] See, e.g., SOF ¶¶ 156, 158, 173, 175-177, 180.

[32] SOF ¶ 181. The contract states that it was made on November 14, 2022 but it appears that the closing took place on November 30, 2022. See Ex. 91. Defendants state that the execution date of the agreement was November 22, 2022. Resp. ¶ 181. In any event, the date of the agreement

has not paid or compensated Balasubramaniam for any work.[33]

II.     ANALYSIS

   A.     Standard Of Review

Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party "discloses 'no genuine issue of material fact' and [thus] demonstrates that 'the moving party is entitled to a judgment as a matter of law.'" Zabala-De Jesus v. Sanofi-Aventis Puerto Rico, Inc., 959 F.3d 423, 427-428 (1st Cir. 2020) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  A dispute is genuine where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (citation omitted).  A material fact is one with the "potential of changing a case's outcome." Doe v. Trustees of Bos. College, 892 F.3d 67, 79 (1st Cir. 2018).

"To avoid 'the swing of the summary judgment scythe,' the nonmoving party must adduce specific facts showing that a trier of fact could reasonably find in his favor." Johnson v. Johnson, 23 F.4th 136, 141 (1st Cir. 2022) (citation omitted).  "The nonmovant cannot rely on 'conclusory allegations, improbable inferences, and unsupported speculation.'" Id. (citation omitted).

"Cross-motions for summary judgment do not alter the basic . . . standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Alasaad v. Mayorkas, 988 F.3d 8, 16 (1st Cir. 2021) (quoting

---

is immaterial for purposes of this motion.

[33] SOF ¶ 155.  On September 12, 2025, Bolla offered to pay Balasubramanian $25,000 for his services as well as actual expenses but it does not appear that he actually paid that amount. See SOF ¶ 176; Resp. ¶ 176; Ex. 88.

Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)).

      B.      Disputed Issues Of Fact Preclude Summary Judgment
             On Balasubramaniam's Breach Of Contract Claim

In order to prove a breach of contract claim, the plaintiff must demonstrate that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach." Brooks v. AIG Sunamerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (citation omitted).[34]  Defendants dispute the existence of a valid contract. See Docket No. 87 at 4-6.

To create an enforceable contract, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Gibson Found., Inc. v. Norris, 88 F.4th 1, 12 (1st Cir. 2023) (quoting Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875 (2000)).  "[A]lthough an exchange of e-mail communications can constitute a contract under Massachusetts law . . . '[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.'" Gibson Found., 88 F.4th at 12 (quoting Cygan v. Megathlin, 326 Mass. 732, 733-734 (1951)).

Determining a term's materiality is "'based on the status of things at the time the parties signaled that an agreement had been reached.'" Ritter v. Johnson, 616 F.Supp.3d 158, 163 (D. Mass. 2022) (quoting Duff v. McKay, 89 Mass. App. Ct. 538, 544 (2016)).  "'[T]hat negotiations eventually were scuttled over an issue does not mean that it necessarily was an essential term.'" Ritter, 616 F. Supp. 3d at 163 (quoting Duff, 89 Mass. App. Ct. at 544).  "[R]esolution of . . .

---

[34] The parties cite to Massachusetts law.  Where the parties have agreed as to the choice of law, courts are "free to 'forego an independent analysis and accept the parties' agreement.'" Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003) (citation omitted).

fact questions, including whether there were material terms yet to be negotiated, are generally reserved for the jury." Ritter, 616 F. Supp. 3d at 163-64 (quoting Situation Mgmt. Sys., 430 Mass. at 879) (internal quotation marks omitted).  Furthermore, the intent of the parties is generally a question of fact because the determination of whether parties intended to be bound must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives of the parties.  Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc., 211 F.Supp.3d 375, 379 (D. Mass. 2016).  Where there is evidence that a reasonable jury could use to support a conclusion of materiality or intention to be bound in either direction, there is a genuine issue of material fact and summary judgment is inappropriate.  See Gibson Found., 88 F.4th at 13-14; see also Romain v. Dever, 82 Mass. App. Ct. 1102 (2012) ("whether material terms legitimately remained to be negotiated, is a question of fact.").

     Balasubramanian argues that the parties agreed that he would work as a "Business Strategy Officer – Inorganic Growth" in return for certain agreed compensation.  Docket No. 80 at 10-11.  According to Balasubramanian, the Defendants memorialized the agreement in the Memorialization Email dated December 30, 2021, and Balasubramanian replied to Defendants' email the next day to confirm the accuracy of their description of the Agreement.  See id.  The language of those emails, however, raises issues as to whether the parties had the present intention to be bound by that email exchange.  For example, the Defendants refer to the email as a "working model" and refer to terms that still need to be discussed and agreed upon.  Ex. 4.  The email also appears to contemplate a further meeting "to discuss and agree on goals and engagement model."  Id.  Balasubramanian's response, moreover, also appears to contemplate further discussions and a formal agreement.  Ex. 5 ("We can use the notes sent by you [] to iron out the details.  I am fine with the broad construct with an understanding we will bring in more

11

clarity and English and fix gaps (will send details).").

The parties' subsequent conduct and communications when the ASA deal was nearing completion could also be viewed as evidence that there had been no meeting of the minds back in December 2021. See, e.g., Ex. 71. Where, as here, the moving party bears the burden of proof at trial, he can prevail only by proving each element of his case with evidence sufficiently compelling that no reasonable jury could return a verdict for the nonmovant. See Am. Steel Electors, Inc. v. Local Union No. 7, Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008) (citing Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35-36 (1st Cir. 1998)). In light of the evidence in the record, this Court is unable to conclude that no reasonable jury would return a verdict in favor of the Defendants on this issue.

    C.        Breach Of The Covenant Of Good Faith And Fair Dealing

Balasubramanian also alleges that Defendants attempted to avoid compensating him for his more than eight months of work by terminating him and restricting his ability to perform under the Agreement in breach the covenant of good faith and fair dealing. See Docket No. 80 at 18-21. "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005). A determination of whether a valid contract in fact existed is therefore first required, which this Court has determined involves questions of fact for a jury to decide.

    D.        Unjust Enrichment/Quantum Meruit

Balasubramanian argues that he is entitled to summary judgment on his unjust enrichment and quantum meruit claims "in the alternative." Docket No. 80 at 21-22, 24-25. As he acknowledges, however, unjust enrichment and quantum meruit claims are precluded by the

existence of a valid and enforceable contract. Docket No. 80 at 21 n.9 (citing In re Lupron Mtkg. & Sales Prac. Litig., 295 F.Supp.2d 148, 182 (D. Mass. 2003)); 24 n.10 (citing Klauber v. Vmware, Inc., 80 F.4th 1, 15 (1st Cir. 2023)). As issues of fact preclude summary judgment on the issue of contract formation, it is inappropriate to grant summary judgment in his favor on this claim at this stage.

E. Fraudulent Inducement

Balasubramanian's claim for fraudulent inducement is also tied to the contractual issues. In essence, he appears to argue that Bolla misrepresented the terms of the parties' agreement. See Docket No. 80 at 22-27. As such, this claim also involves issues of fact not appropriate for summary judgment

F. Liability Of Bolla And Vakalapudi

Defendants Bolla and Vakalapudi move for summary judgment on the claims against them on the grounds that Balasubramanian must first pierce Source's corporate veil before any personal liability may attach against them. Docket No. 68 at 8-12.

1. Fraudulent Inducement

Bolla is named in Balasubramanian's fraudulent inducement claim. See Complaint at ¶¶ 99-107. "It is not necessary in all instances . . . to pierce the corporate veil in order to hold a corporate officer liable for a corporation's torts." In re Gannon, 598 B.R. 72, 82 (Bankr. D. Mass. 2019) (citing Townsends, Inc. v. Beaupre, 47 Mass. App. Ct. 747, 751 (1999)). "A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party." Id. Balasubramanian, therefore, does not have to pierce the corporate veil to hold Bolla liable for fraudulent inducement so long as he can show

that Bolla personally participated in the tort.  Here, there is evidence that Bolla had complete control over Source and personally made some of the alleged misrepresentations to Balasubramanian.  See, e.g., SOF ¶¶ 4, 17-18, 21, 23-24.  To the extent that Defendants argue that there is not sufficient evidence of fraudulent inducement, this Court finds that issues of fact preclude summary judgment on this issue.  See, e.g., SOF ¶¶ 24-30, 93-94, 160.

    2.      Unjust Enrichment

Both Bolla and Vakalapudi are named in Balasubramanian's unjust enrichment claim.  See Complaint at ¶¶ 91-98.  Whether or not a corporate defendant may be held personally liable on an unjust enrichment theory without piercing the corporate veil depends on whether the unjust enrichment claim sounds in contract or tort.  See Focused Impressions, Inc. v. Sourcing Group, LLC, No. 19-cv-11307-ADB, 2020 WL 1235366, at *6 (D. Mass. Mar. 13, 2020).  If the unjust enrichment claim sounds in tort, it is not necessary to pierce the corporate veil.  See id.

"Under Massachusetts law, the question of whether a claim [of unjust enrichment] sounds in contract or tort depends upon the nature and essence of the claim."  Id. (citation omitted).  Here, Balasubramanian's claims are based on an alleged contractual relationship between the parties and Source's alleged breach of that contract.[35]  As such, Balasubramanian must pierce the corporate veil in order to hold Bolla and/or Vakalapudi personally liable on the unjust enrichment claim.

"[C]orporations are generally to be regarded as separate from each other and from their respective stockholders . . . where there is no occasion 'to look beyond the corporate from for the purpose of defeating fraud or wrong, or for the remedying of injuries."  My Bread Baking Co. v.

---

[35] Even if his unjust enrichment claim sounded in tort, Balasubramanian has adduced no evidence that Vakalapudi directed, controlled, approved, or ratified the alleged conduct.

Cumberland Farms, Inc., 353 Mass. 614, 618 (1968) (internal citations omitted). "Under unusual circumstances, however, a court may disregard the separateness of the entities, particularly to defeat fraud or remedy and injury." Safeguard Prop. Mgmt., LLC v. Zoll, No. 22-cv-110004-DJC, 2022 WL 16838781, at *6 (D. Mass. Nov. 8, 2022) (citation omitted). Courts considering whether to set aside corporate formalities, consider the following twelve factors:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 556 n.19 (2000) (citations omitted). "These factors are not simply added up, but rather are considered in an integrated manner based on all of the facts presented." Lothrop v. North Am. Air Charter, Inc., 95 F.Supp.3d 90, 101 (D. Mass. 2015).

Balasubramanian has pointed to evidence that Vakalapudi is the sole owner and President of Source; that Bolla exercised complete control over all business decisions; that Source failed to conduct corporate meetings; and that Vakalapudi admitted to not having any meaningful involvement in the management and operations of Source. See SOF ¶¶ 4-5, 186, 205-208; Resp. ¶¶ 186, 199, 201. Rather, her role was limited to signing documents at Bolla's direction. Resp. ¶ 199. While other factors may cut against piercing the corporate veil or have not been addressed, sufficient evidence has been presented to raise an issue of fact on whether the corporate veil should be pierced.[36]

---

[36] To the extent that Balasubramanian argues that summary judgment is not appropriate because Defendants have not provided discovery regarding these issues, it is now too late to raise this argument. It was incumbent upon Balasubramanian to move to compel such information if he

Finally, to the extent that Defendants argue that Balasubramanian cannot prevail on an unjust enrichment claim, disputed issues of fact also preclude summary judgment on this issue. The summary judgment record contains evidence that Balasubramanian identified and analyzed potential acquisition targets; communicated with Defendants regarding those targets; and participated in the negotiations and due diligence of ASA, ultimately resulting in its acquisition. See, e.g., SOF ¶¶ 31-32, 35, 63, 65, 69, 70, 71, 73, 75, 76, 82, 132; Resp. ¶¶ 63, 65, 69, 70, 71, 73, 75, 76, 82, 132. In addition, there is also evidence that Defendants retained the benefit of Balasubramanian's work without compensating him. See SOF ¶¶ 155, 181. Accordingly, summary judgment is not appropriate.

III. ORDER

For the foregoing reasons, I deny both motions. This Court will set the case for trial.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
U.S. MAGISTRATE JUDGE

---

believed that it was improperly withheld. While he did file a motion to compel, see Docket No. 55, Balasubramanian did not specifically address the Defendants' alleged failure to produce documents bearing on this issue.